# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | |
| JUSTIN DEVAN JOHNSON, | Criminal Action No. TDC-16-0135 |
| Defendant. | |

## MEMORANDUM OPINION

On January 22, 2016, the Prince George's County Police Department stopped a vehicle because it did not have a registration sticker on its license plate, conducted pat frisks on the two occupants, and initiated a search of the car. Defendant Justin Devan Johnson, the passenger in the vehicle, seeks suppression of a firearm and other evidence found in a backpack in the trunk after he asked for permission to retrieve a battery necessary to power a medical device that sustains his life. At issue is whether the officers' actions comported with the Fourth Amendment to the United States Constitution. Because the Court concludes that they did not, Johnson's Motion to Suppress Tangible Evidence and Statement is GRANTED.

## BACKGROUND

On April 6, 2016, a grand jury returned an indictment against Johnson in which he was charged with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). On September 16, 2016, Johnson filed a Motion to Suppress Tangible Evidence and Statement in which he sought suppression of a firearm and ammunition seized during the traffic stop on January 22, 2016, as well as post-arrest statements. At an evidentiary hearing on April 3, 2017, the Court heard testimony from Prince George's County Police Department ("PGPD") Officer

Cory Nelson ("Officer Nelson"), PGPD Officer Nicholas Hernandez ("Officer Hernandez"), and Defendant Johnson. Based on this testimony, and several exhibits introduced at the hearing, the Court makes the following findings of fact.

On the afternoon of January 22, 2016, Johnson and his brother, Darien Simpson, were traveling westbound on Marlboro Pike in District Heights, Maryland in a Hyundai Sonata that Johnson had rented from Enterprise Rent-A-Car ("Enterprise") the previous day. Simpson was driving, and Johnson was riding in the front passenger seat. At approximately 2:15 p.m., Officer Nelson, who was patrolling the 5800 block of Marlboro Pike in a marked police cruiser, observed the Sonata and noticed that the rear license plate was missing validation tabs, required by Maryland law, which consist of stickers showing the date of expiration of the vehicle's registration. Officer Nelson activated his emergency equipment and pursued the Sonata. Simpson pulled over to the side of the road.

Officer Nelson exited his police cruiser, approached the driver's side of the Sonata, and informed Simpson that the vehicle was missing validation tabs on the rear plate. Simpson showed Officer Nelson a second license plate bearing the required validation tabs, which he retrieved from the area between the driver's seat and the center console, and told him that the car was rented. Undeterred, Officer Nelson obtained Simpson's driver's license, but he did not ask to see the registration for the vehicle or the rental agreement. He returned to his police cruiser to run a records check, which revealed that Simpson's license was suspended, but did not identify any open warrants or other derogatory information about Simpson. Officer Nelson then called for backup, and approximately 30 seconds later, Officer Hernandez, who had been patrolling only a short distance away, arrived on the scene. According to Officer Nelson, when there are

two occupants in a car that has been stopped, PGPD officers always call for backup for officer safety.

Officer Nelson then approached the car, informed Simpson and Johnson that Simpson's license was suspended, and asked Johnson for identification. Although Officer Nelson testified that he wanted to determine whether Johnson "had a valid license so they could perhaps drive away" at the conclusion of the stop, he did not inform Johnson of the reason he was asking for his identification. Tr. at 17. According to Officer Nelson, Johnson handed him a Maryland learner's permit with an issue date of October 28, 2015 and an expiration date of September 4, 2017. A learner's permit would not have permitted Johnson to drive the car away. According to Johnson, he did not give Officer Nelson his learner's permit or any other identification; rather, he testified that in response to a later request from Officer Hernandez, he handed over a valid provisional driver's license, which permitted him to drive the car alone. Whichever document was provided, Officer Nelson asked no questions about it. During this exchange, Johnson offered to show Officer Nelson the rental agreement for the car, but Officer Nelson did not take it.

Officer Nelson returned to his vehicle again and ran a records check on Johnson's identification. The computer system used by Officer Nelson automatically provides information from both the Maryland Motor Vehicle Administration ("MVA") and the National Crime Information Center ("NCIC"). The search therefore provided information about both Johnson's driver's license status and the existence of any outstanding warrants. The report generated based on Johnson's identification contained specific information reflecting that Johnson possessed a valid provisional driver's license, not a learner's permit. The top of the report included biographical data for Johnson; just below that information, midway down the first page, the

report stated that Johnson possessed a "Class C," type "G" driver license issued on January 8, 2016, with an expiration date of March 21, 2024. Gov't Ex. 13. Johnson's license status was listed as "VALID." *Id.* Officer Nelson testified that "Class C" refers to a regular driver's license. He also acknowledged that if an individual has a Maryland learner's permit that is not suspended or otherwise restricted, the license status would not read "VALID," as it would for a Maryland driver's license, but would instead be labeled as "ELIGIBLE." Thus, this information plainly stated that Johnson had a valid driver's license at the time of the traffic stop.

Officer Nelson, however, stated that as of the date of the traffic stop on January 22, 2016, he had not been trained on how to read these records, so even though he looked at the license status entry, he was not familiar enough with the terminology to understand that a license status of "VALID" referred to a driver's license, and that a license status of "ELIGIBLE" would refer to a learner's permit. Officer Nelson further stated that he was not sure whether type "G" referred to a provisional driver's license. He explained that he had not been trained in reading these reports and that "it's kind of learn as you go." Tr. at 65.

Officer Nelson also testified that at the time he ran the records check, he "hadn't noticed," *id.* at 22-23, the entries indicating that Johnson had a valid driver's license and did not recall what the report stated with respect to Johnson's driver's license. Rather, Officer Nelson acknowledged that his main interest in conducting the records check was to determine whether there were any open warrants against Johnson. None were found. Thus, despite having reviewed records showing that Johnson had a valid driver's license, Officer Nelson concluded that Johnson could not legally drive the car away on his own.

At that point, having found no warrants or basis to further detain either occupant, Officer Nelson planned to issue citations to Simpson for driving with a suspended license and without

the required validation tabs, but did not plan to place him under arrest. He had no plans to issue citations to Johnson. Although he had not asked about Johnson's license status, the availability of a driver, or the ownership of the car, Officer Nelson decided to impound the car and conduct an inventory search. He envisioned that Simpson and Johnson would be allowed to leave the scene, though they would have to "find alternative means of transportation." *Id.* at 26.

Officer Nelson, however, did not write out citations for Simpson. Nor did he inform Simpson or Johnson that citations would be issued or that the car would be impounded and searched. Instead, without telling him of the purpose of the traffic stop or his plan to search the car, Officer Nelson enlisted Officer Hernandez to approach the vehicle, with Officer Nelson on the driver's side and Officer Hernandez on the passenger side. Without explanation, the officers ordered Simpson and Johnson out of the car and conducted pat frisks for weapons on both individuals. No weapons were found. Nothing during the stop had thus far indicated that either Simpson or Johnson presented a threat to either officer; rather, Officer Nelson testified that the frisks were conducted pursuant to PGPD training, which provides that officers should conduct routine pat-downs "to ensure the safety of officers on the scene" any time a driver or passengers are asked to exit a vehicle during a traffic stop. *Id.* at 45. After the frisks, Simpson and Johnson were escorted to the rear of the vehicle and directed to stand there.

Officer Nelson then opened the driver's side door and began to search the vehicle. At the time, Officer Nelson had not told Officer Hernandez that he planned to impound the car and conduct an inventory search. Officer Hernandez testified that he was not aware of these facts because "it wasn't my stop," so he "didn't know" what Officer Nelson's "intentions were." *Id.* at 87.

Because of a heart condition, Johnson wears a left ventricular assist device ("LVAD"). The LVAD consists of an external controller, worn around the waist, which is connected to wires that enter Johnson's abdomen and connect to an internal heart pump that helps blood flow through his heart. The controller contains two batteries, each with a life of four hours. The LVAD can operate with one battery, but without at least one live battery, the LVAD would stop working, and Johnson could die. Replacement batteries are not available in regular stores and must be obtained from a hospital. At the time of the search, the first battery had run out of charge.

Johnson observed Officer Nelson begin the search of the vehicle. Johnson also overheard Officer Nelson ask for a tow truck. Believing that he and Simpson were going to be taken to jail and that the car would be taken elsewhere, Johnson informed Officer Hernandez that he had a heart condition, the batteries on the controller were low, and if the batteries stopped, he would die. Johnson advised Officer Hernandez that he had an extra battery in his bookbag, located in the trunk of the vehicle, and asked if he could retrieve it. Officer Hernandez replied that Johnson could not, but stated that he would retrieve the battery for him. Officer Hernandez then opened the trunk to retrieve the battery pack from the bookbag. When Officer Hernandez asked in which compartment the battery was located, Johnson told him that it was in the big pouch. Officer Hernandez found the battery and handed it to Johnson, who replaced the dead battery in the controller. Throughout this exchange, Johnson's demeanor was calm.

While reaching into the bookbag, Officer Hernandez also noticed the butt end of a gun. He alerted Officer Nelson of what he had found by whispering, "7A," which is "police code for handgun," *id.* at 29, but allowed Johnson to switch the battery before acting on the handgun. Immediately after Johnson handed the used battery to Officer Hernandez, the officers ordered

both Johnson and Simpson to the ground, handcuffed and searched them, and reported the gun recovery by radio. Up to this point, the traffic stop had lasted 10 minutes.

Johnson and Simpson were both transported to the police station. A search of the bookbag revealed, in addition to the gun and its loaded magazine, a rubber glove containing ammunition, Johnson's birth certificate, and his social security card. Johnson's valid provisional driver's license was also recovered, but Officer Nelson could not recall whether it was located in the bookbag or vehicle, on Johnson's person, or elsewhere. Although Officer Nelson claimed that he completed an inventory search of the Sonata back at the station, no inventory list was produced, and he could not recall what items, such as the rental agreement, were in the car at the time it was returned to Enterprise. He did not complete and issue the citations to Simpson until Simpson had been transported to the Department of Corrections.

## DISCUSSION

Johnson seeks suppression of the physical evidence recovered during the traffic stop. He argues that there was no legal basis to stop the car, that the officers' conduct exceeded the scope of a valid investigatory stop and thus tainted the recovery of the firearm under *Wong Sun v. United States*, 371 U.S. 471 (1963), and that he did not voluntarily consent to the search of the bookbag. The Government asserts that the stop was justified because Simpson committed a traffic violation, the officers' actions were justified under the circumstances, the search of the bookbag was justified because Johnson consented to it, and even if there was no consent, the gun would have inevitably been recovered during an inventory search of the impounded car. The Court concludes that although the initial traffic stop was permissible, the officers engaged in multiple constitutional violations that irreparably tainted the rest of the encounter and the recovery of the firearm and ammunition.

7

## I.    Traffic Stop

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Because an ordinary traffic stop is a limited seizure more akin to an investigative detention than a custodial arrest, courts assess the constitutionality of traffic stops under the dual inquiry articulated in *Terry v. Ohio*, 392 U.S. 1 (1968). Terry's two-pronged analysis requires the Government first, to establish that the officer's action was "justified at its inception," and second, to demonstrate that the "officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011). A traffic stop is justified at its inception if the officer conducting the stop has a reasonable, articulable suspicion of illegal activity. *United States v. Johnson*, 734 F.3d 270, 275 (4th Cir. 2013). This standard is met when an officer observes a traffic violation. *Id.*

Officer Nelson testified that he stopped the Sonata because it was missing Maryland "validation tabs," which consist of stickers displaying the car registration's expiration date that must be placed on the top left- and right-hand corners of the rear license plate. Tr. at 8-9. Under Maryland law, vehicles registered in Maryland must display both the registration plates and validation tabs issued for the vehicle. Md. Code Ann., Transp. § 13-411(d)-(e). Johnson argues that Johnson lacked reasonable suspicion of a violation of the Maryland Code because that provision does not explicitly require validation tabs to be placed on the rear license plate. This argument is meritless. Maryland transportation regulations require that "validation stickers shall be displayed on the rear registration plate on or before the expiration date of the registration." Md. Code Reg. § 11.15.16.02(B)(2) (2017). The only reasonable interpretation of "validation

sticker" is that it has the same meaning as "validation tab." Officer Nelson's reasonable suspicion that the Maryland Code was violated because the Sonata did not have required validation tabs on the rear license plate provided a sufficient basis for the initial traffic stop. *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008) ("Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop."); *Johnson*, 734 F.3d at 275 (upholding a traffic stop based on a violation of Maryland law requiring that a vehicle's registration tags be clearly legible). In addition, based on his reasonable suspicion, Officer Nelson was permitted to obtain Simpson's license and run the license check that led to the discovery that Simpson's license was suspended. *See Branch*, 537 F.3d at 335.

## II.    Frisk

Upon discovering that Simpson's license was suspended, Officer Nelson did not immediately issue a citation for that violation or for the initial validation tab violation. Instead, he ran a records check on the passenger, Johnson, then decided to order both occupants out of the car and conduct pat frisks on them. According to Officer Nelson, he took this action because, based on the mistaken belief that Johnson did not have a valid driver's license, he was planning to impound the vehicle and conduct an inventory search at the scene.

Officer Nelson was permitted to require both Simpson and Johnson to step out of the vehicle. Under *Maryland v. Wilson*, 519 U.S. 408 (1997), a police officer may, as a matter of course, order the driver and passenger of a lawfully stopped vehicle to exit the vehicle. *Id.* at 414-15. He was also permitted to detain Johnson at the scene for the duration of the stop. *See Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop."). Indeed, a "traffic

stop of a car communicates to a reasonable passenger that he or she is not free to terminate the encounter with the police and move about at will." *Id.* Thus, Johnson remained detained throughout the encounter. *See United States v. Powell*, 666 F.3d 180, 187 n.8 (4th Cir. 2011) (stating that the defendant, a passenger in a car, "was seized when the stop occurred, *but* his initial seizure ended when Corporal Patterson gave him permission to leave" (emphasis added)).

"To justify a patdown of the driver or a passenger during a traffic stop, however, just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Johnson*, 555 U.S. at 327; *Powell*, 666 F.3d at 185-86. To meet this standard, the officers must have "a particularized and objective basis for suspecting that the person to be frisked is armed and dangerous." *Powell*, 666 F.3d at 185-86. The test is whether a "reasonably prudent" person "in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* (quoting *Terry*, 392 U.S. at 27).

In *Powell*, officers conducted a nighttime traffic stop based on a burned-out headlight and encountered a driver and two passengers. *Id.* at 183. When a records check revealed that the driver was operating on a suspended driver's license, an officer asked the defendant whether he had a valid driver's license in order to assess whether he could drive the car away after the traffic stop. *Id.* at 183-84. When a records check on the defendant's driver's license revealed that the defendant's license was also suspended, and that the defendant had previously been charged with armed robbery, the officer ordered him out of the car and conducted an "officer-safety pat-down." *Id.* at 182, 184. The United States Court of Appeals for the Fourth Circuit held that where the encounter had been "entirely amicable and cooperative," there had been no "threatening or evasive conduct," and there was no indication of drug dealing, gang affiliation, or

a concealed weapon, the information about the prior robbery charge and the allegation that the defendant misrepresented that he had a valid license were not enough to justify the pat frisk. *Id.* at 187-89.

Here, even more than in *Powell,* the circumstances of the stop do not establish reasonable suspicion that Johnson was armed and dangerous. There was no testimony that the stop, which occurred in the middle of the afternoon, was in a high-crime location, or that either Simpson or Johnson was unusually nervous or made furtive gestures. *Cf. United States v. George*, 732 F.3d 296, 300 (4th Cir. 2013) (holding that a pat-down of a passenger was justified where the stop occurred at 3:30 a.m. in a "high-crime area," the vehicle was "aggressively chasing the vehicle in front of it," the driver of the vehicle made misleading statements, and the defendant acted nervously and made furtive movements). Both officers testified that Johnson was calm throughout the encounter, and neither testified that he was uncooperative in any way. Neither officer identified any circumstances that would have suggested the presence of a weapon. The records checks on both Simpson and Johnson revealed no warrants or other indications of past criminal activity. Indeed, the Government made no attempt to argue that the pat frisk was justified because of a concern that Johnson was armed and dangerous. Rather, Officer Nelson testified that pat-downs for officer safety are a routine step in a traffic stop, conducted pursuant to PGPD training. Conducting pat frisks as a matter of course, without a specific basis to reasonably believe that a suspect is armed and dangerous, plainly violates the Fourth Amendment. *See Johnson*, 555 U.S. at 327; *Powell*, 666 F.3d at 189; *United States v. Burton*, 228 F.3d 524, 528 (4th Cir. 2000).

There is a factual dispute whether Officer Hernandez obtained consent before frisking Johnson. At the hearing, Officer Hernandez testified that when he ordered Johnson out of the

car, he first asked whether Johnson had any weapons, and Johnson said no. He then asked if Johnson minded if he checked, to which Johnson also said no, leading Officer Hernandez to then pat frisk Johnson. Johnson, however, testified that not only did he not consent to the frisk, but that he was directed to turn around and place his hands behind his back, that he was handcuffed, and that Officer Hernandez then frisked him before the cuffs were removed.

Officer Hernandez's account was inconsistent not only with Johnson's version of events, but also with Officer Nelson's testimony. Officer Nelson definitively testified that he had ordered both occupants out of the car and that they were patted down for weapons as a matter of course pursuant to departmental training. Significantly, Officer Nelson's police incident report states that Simpson and Johnson "were removed from the vehicle and patted down for weapons with negative results" and makes no mention of a consent search of Johnson. Def. Ex. 3. In light of Officer Nelson's position that the officers were performing routine officer-safety pat-downs, not consent searches, and Johnson's denial that he was asked to or did consent to a frisk, the Court does not credit Officer Hernandez's testimony regarding consent and cannot find by a preponderance of the evidence that Johnson consented to the pat frisk.

Even if the colloquy had occurred as Officer Hernandez described, the Court would not find that Johnson voluntarily consented to a pat frisk. Officer Hernandez's question "Do you mind if I check?" did not clearly convey that checking for weapons would consist of a search of Johnson's person, and the surrounding circumstances—particularly the fact that both Simpson and Johnson had just been ordered out of the car and Simpson had been pat frisked without consent—were sufficiently coercive that Johnson's acquiescence was not voluntary. Consequently, where there was no evidence to establish a reasonable belief that Johnson was

armed and dangerous, the Court finds that the pat frisk was unconstitutional. *See Powell*, 666 F.3d at 189.

## III.    Search

After the pat frisks, Officer Nelson initiated a search of the car.  Having made the decision not to arrest Simpson but instead to issue a citation, and offering no other basis to conduct a warrantless search of the car, Officer Nelson explained his actions by stating that he decided to impound the vehicle and to conduct an inventory search at the scene because he had determined that Simpson, the driver, had a suspended license, and that Johnson, who had provided him with a learner's permit, was not authorized to drive the car away. Johnson disputes this account.  He testified that Officer Nelson never asked him for identification; that he was carrying his provisional driver's license, not his learner's permit; and that he provided the provisional license to Officer Hernandez, not Officer Nelson.

A police intrusion into a vehicle without a warrant is constitutionally permissible where the vehicle was "impounded or otherwise in lawful police custody" and "where the process is aimed at securing or protecting the car and its contents." *South Dakota v. Opperman*, 428 U.S. 364, 373 (1976).  Under the inventory search exception to the warrant requirement, Officer Nelson's actions can be justified if (1) the decision to impound the vehicle was reasonable; and (2) the inventory search was conducted pursuant to standard police procedures to secure the car and its contents, and not for the purpose of gathering incriminating evidence. *United States v. Brown*, 787 F.2d 929, 932 (4th Cir. 1986).  The Government has the burden to show justification for both. *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971) (holding that the burden is on the Government to show that an exception to the warrant requirement applies).

13

### A. Impoundment

A decision to impound a vehicle comports with the Fourth Amendment if "the circumstances reasonably justified seizure or impoundment." *United States v. Bullette*, 854 F.3d 261, 265-66 (4th Cir. 2017) (stating that the decision to impound was reasonable where the vehicle lacked a license plate or registration and appeared to have been abandoned, officers could not identify the owner, and the vehicle may have contained explosive materials). The Government asserts that the decision to impound the Sonata was reasonable because it followed the Prince George's County ordinance governing impoundment of vehicles without prior notice. *See* Prince George's Cty., Md. Code of Ordinances § 26-166 (2015). Of the enumerated bases for impounding a vehicle, the Government offered the following reasons as potentially applicable:

> A vehicle subject to impoundment under any provision of Federal, State, or local law may be impounded without giving prior notice to its owner under the following circumstances:
> (1) When the vehicle is impeding or is likely to impede the normal flow of vehicular or pedestrian traffic; or . . .
> (3) When the vehicle imposes an immediate danger to public safety; or . . .
> (6) When the operator of the vehicle has been taken into custody and the impoundment is reasonably necessary to provide for the safekeeping of the vehicle.

*Id.* § 26-166(a). Here, subsection (6) is inapplicable because Officer Nelson testified that he had no plan to take Simpson into custody and instead was going to issue a citation. No testimony was offered regarding any immediate danger to public safety. As for the whether the car was "impeding or likely to impede the normal flow" of traffic, Officer Nelson testified that when he stopped the Sonata, it pulled over on the side of Marlboro Pike in an area where there is no shoulder. By contrast, Johnson stated that there was, in fact, a shoulder, and argued that the Government's own exhibit, a close-up photo showing the rear of the vehicle, demonstrated that

the car was not stopped in an area where traffic was moving, as demonstrated by the undisturbed light snow appearing underneath the car.

Even assuming that the Sonata was stopped in a travel lane on Marlboro Pike and thus would impede traffic, the circumstances did not reasonably justify impoundment. *See Bullette*, 854 F.3d at 265. The Fourth Circuit has recognized that whether an impoundment is reasonable depends on whether there was "no known individual immediately available to take custody of the car." *Brown*, 787 F.2d at 932; *United States v. Cartrette*, 502 F. App'x 311, 315 (4th Cir. 2012); *see also United States v. Duguay*, 93 F.3d 346, 353 (7th Cir. 1996) (holding that "the decision to impound an automobile . . . is only valid if the arrestee is otherwise unable to provide for the speedy and efficient removal of the car from thoroughfares or parking lots"). Thus, officers generally determine that no such driver is present and authorized to drive the car before ordering impoundment. *See, e.g.*, *United States v. Matthews*, 591 F.3d 230, 233 & n.3 (4th Cir. 2009) (stating that a car was not impounded until the officer verified that the passenger, who had only an out-of-state learner's permit, and the passenger's sister, who came to pick up the passenger but had a suspended license, were not authorized to drive the car); *Brown*, 787 F.2d at 930 (stating that the decision to impound was made only "[a]fter determining that everyone in Brown's car had been drinking" and could not drive); *see also United States v. Battle*, 370 F. App'x 426, 427-28 (4th Cir. 2010) (noting that the decision to impound was made after the officer determined that the driver had no license and the passenger "could not lawfully operate the vehicle because his driver's license also had been suspended"). Indeed, Officer Nelson testified that the reason he decided to impound the vehicle was his belief that Johnson, who had presented him with a learner's permit, could not lawfully drive the car away. At oral argument, the Government conceded that had Officer Nelson known that Johnson had a valid driver's

15

license, and had Johnson shown that he was the registered renter of the car, Officer Nelson would not have impounded the vehicle, but instead would have issued citations to Simpson and allowed Johnson to drive the car away.

Even if the Court credits Officer Nelson's testimony that Johnson handed him a learner's permit, Officer Nelson acknowledged that he ran a computerized records check based on the permit, and that the record displayed revealed that Johnson, in fact, possessed a valid provisional driver's license that gave him the right to drive. Not only did the computerized record prominently show that Johnson had a "Class C" license, which Officer Nelson knew to be a regular driver's license, but it also specifically stated that Johnson's license status was "VALID," a term that would not be used to refer to a learner's permit. Having viewed the computerized records, Officer Nelson offered inconsistent explanations for failing to recognize that Johnson had a valid license. At one point, he stated that he looked for the license status, but did not understand, due to a lack of training, that the "VALID" entry referred to a driver's license and would not refer to a learner's permit. At other points, he testified that he did not "recall," had not "noticed," or was not "focusing" on what the records check revealed about Johnson's license status because he ran the records check primarily to check for open warrants, not to check the license status. Tr. at 20, 22-23, 67.

Both explanations ring hollow. It is not reasonable for a police officer to run a records check but fail to consider information that appears in plain view when that information is material to the decision to impound a vehicle. Nor is it an excuse that the officer may not have understood the terminology used in the records. When officers use these computerized records checks routinely, they have a responsibility to understand how to read them. Even if Officer Nelson did not intentionally overlook this information, excusing such errors without

16

consequence would incentivize law enforcement to avoid searching for, or even to deliberately close its eyes to, information that may lead to a less preferred result. Thus, by itself, Officer Nelson's failure to consider the information he personally reviewed showing that Johnson was a registered driver rendered the decision to impound unreasonable.

Furthermore, although Officer Nelson asked Johnson for identification, he never asked Johnson whether he possessed a valid driver's license or informed him that he was seeking to determine whether Johnson had the authority to drive the car away. Had he done so, Johnson would have understood the need to provide a driver's license, not some other form of identification, and would have quickly established that he was authorized to drive because his provisional license was in the car, and because a second look at the computerized records would have verified his status. Moreover, once he decided to impound the car, Officer Nelson never explained to Simpson and Johnson that the car was going to be impounded because there was no licensed driver available to drive it away, and that as a result he was going to conduct an inventory search to secure their belongings. *See Brown*, 787 F.2d at 931 (noting that prior to impoundment of the vehicle, the officer told the driver the car was being impounded and asked if he would agree to have an officer drive the car to the police station instead of having it towed). Incredibly, he did not even tell Officer Hernandez of the decision to impound or the purpose of the search. Any such explanation, even a brief one, would necessarily have caused Johnson to understand that he needed to provide proof of his license status.

The Government argues that to the extent Officer Nelson erroneously concluded that Johnson could not drive the car away, it was a reasonable mistake under the circumstances, and courts "allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests." *Maryland v. Garrison*, 480 U.S. 79, 87 (1987); *see also*

*Herring v. United States*, 555 U.S. 135, 147 (2009) (finding that the exclusionary rule should not apply "when police mistakes are the result of negligence . . . rather than systemic error or reckless disregard of constitutional requirements"). In *Herring*, the Court held that the exclusionary rule did not require suppression of evidence found after an arrest made based on erroneous information contained in a computer database of arrest warrants, where the data was input by others and the arresting officers "were entirely innocent of any wrongdoing." 555 U.S. at 138.

Unlike in *Herring*, however, the conduct here went beyond mere negligence, and Officer Nelson was not blameless. Even if Officer Nelson's failure to recognize from the records check that Johnson had a valid driver's license could be deemed reasonable, the remaining circumstances establish the unreasonableness of Officer Nelson's decision to impound the Sonata. Throughout the encounter, Officer Nelson inexplicably failed to take routine steps that would necessarily have revealed that Johnson was licensed to drive the car away. First, Officer Nelson never asked Simpson for the vehicle registration, or otherwise sought to verify the status of the vehicle such as by reviewing the rental agreement. Reviewing such documents is a standard step in a traffic stop. *See, e.g., Rodriguez v. United States*, 135 S. Ct. 1609, 1615-16 (2015) (stating that ordinary inquiries incident to a traffic stop include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance"); *United States v. Hill*, 852 F.3d 377, 382 (4th Cir. 2017) (stating that during a traffic stop, ordinary inquiries include "verifying the registration of a vehicle and existing insurance coverage"); *United States v. Vaughan*, 700 F.3d 705, 707-08 (4th Cir. 2012) (noting that the officer reviewed the driver's license, registration, and vehicle rental agreement during a traffic stop); *Digiovanni*, 650 F.3d at 502 (noting that when asked for

18

license and registration, the driver provided the rental contract because the car was rented).
Notably, Simpson informed Officer Nelson that the car was rented, and Johnson offered to show
him the rental agreement, but Officer Nelson never sought to verify that the car was properly
registered to the rental company and rented by the occupants. If he had done so, he would have
seen that the rental agreement specifically listed Johnson as the renter, which would, at a
minimum, support further inquiry into whether Johnson possessed a valid license, since
presumably a rental car company would not rent a car to an unlicensed driver.

In *Duguay*, the court suppressed evidence where it determined that the decision to
impound a vehicle upon the arrest of a passenger was unreasonable where the driver was present
on the scene and had the keys to the car, and the passenger's brother, who was the son of the
registered owner of the car, was also present. 93 F.3d at 353. The court concluded that since the
ostensible purpose for impoundment is the "caretaking" of the streets, the practice of
"impounding a car without regard to whether the defendant can provide for its removal is
patently unreasonable." *Id.* Here, where Officer Nelson specifically reviewed records showing
that Johnson had a valid driver's license but failed to recognize their meaning, and at the same
time did not take standard steps that would have easily revealed Johnson's authorization to drive
and status as the registered renter of the car, the decision to impound was likewise not
reasonable. In particular, the highly unusual actions and omissions of Officer Nelson, including
his failure to ask for the car's registration, to review the rental agreement, to ask if Johnson was a
licensed driver, to review the license information during the records check, and to inform
Simpson and Johnson that he was impounding the car because there was no available driver,
raises the concern that the officer was focused more on investigating the occupants than

processing the validation tab and suspended license violations.   The Court therefore finds that the decision to impound was not reasonable.

### B.    Inventory Search

Because the decision to impound the Sonata was unreasonable, Officer Nelson did not have a valid basis to conduct an inventory search.  Even if he had a basis to initiate an inventory search, the Government has not established that Officer Nelson's initial entry into the vehicle to conduct a search was pursuant to a valid inventory search.

The inventory search exception to the warrant requirement applies only when an inventory search is conducted pursuant to standardized departmental procedures that limit police discretion.  *Colorado v. Bertine*, 479 U.S. 367, 375-76 (1987); *Opperman*, 428 U.S. at 374-76; *Bullette*, 854 F.3d at 265 (holding that an inventory search of an automobile is lawful only if "law enforcement conducts the inventory search according to routine and standard procedures designed to secure the vehicle or its contents").  While inventory searches are "normally valid, the importance of having such inventories conducted only pursuant to standardized police procedures has often been stressed."  *United States v. Ford*, 986 F.2d 57, 60 (4th Cir. 1993) (quoting *Bertine*, 479 U.S. at 376).  Any exercise of police discretion in conducting an inventory search must be "according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity."  *Bertine*, 479 U.S. at 743.  There is no requirement that a standardized procedure be codified in writing; procedures may be proven by reference to a written police department policy or simply testimony regarding standard practices.  *Matthews*, 591 F.3d at 235; *see also Bullette*, 854 F.3d at 266 ("The government need not provide a written inventory policy . . . so long as the district court has sufficient evidence to ensure that the practice conforms to our precedent.").

Here, the Government presented neither a written policy articulating the PGPD's standardized inventory procedures nor testimony describing PGPD's standard inventory practices. *Cf. Florida v. Wells*, 495 U.S. 1, 3-5 (1990) (holding that an inventory search was "not sufficiently regulated to satisfy the Fourth Amendment" where the record contained no evidence of a standardized policy regarding the inventory search of closed containers in a vehicle). Although Officer Nelson asserted that his initiation of a search of the Sonata was an inventory search, the Government offered no evidence to establish that his entry complied with any established procedure, or even that such a procedure exists. For example, there was no evidence offered to show that PGPD's inventory search policy permitted Officer Nelson to conduct inventory searches at the scene rather than at the police station; conduct the inventory search even before a citation had been issued to the driver; initiate the inventory search without informing the driver, owner, or renter of the nature of the search; conduct a search without any apparent means to document the contents of the vehicle; or make no formal record of the inventory search.

The failure to provide evidence to establish that Officer Nelson's actions complied with PGPD policies or procedures articulating when and how PGPD officers may conduct an inventory search is particularly troubling because some of the actions taken by Officer Nelson appear to be inconsistent with the conduct of a valid inventory search and thus raise a concern that the search was initiated for an investigative purpose. *See Brown*, 787 F.2d at 932 ("If the vehicle is in lawful custody, the police may inventory the vehicle . . . so long as the purpose of the inventory is to secure the car or its contents *and not to gather incriminating evidence against the owner*." (emphasis added)). *See also United States v. Haro-Salcedo*, 107 F.3d 769, 773 (10th Cir. 1997) (holding that search of a vehicle was not a proper inventory search where the officer

"used the roadside inventory as a pretextual investigatory search"); *United States v. Monclavo-Cruz*, 662 F.2d 1285, 1289 (9th Cir. 1981) (holding that search of a purse did not qualify as an inventory search where the officer "clearly had an investigatory purpose"). Although the purpose of the traffic stop was to address the lack of validation tabs and later included the need to address Simpson's driving with a suspended license, Officer Nelson moved immediately to search the car even before he issued the citations. He began the search without explaining to Simpson or Johnson that the search was for the sole purpose of documenting the contents prior to impoundment. He did not even tell his fellow officer, Officer Hernandez, that he was conducting an inventory search. Officer Hernandez testified that it was "not true" that he knew the car would be searched and claimed not to have even known that the car was going to be impounded. *Id.* at 89.

Although documentation would be the purpose of an inventory search, there was no indication that Officer Nelson was prepared to document the contents of the vehicle, with a standard form or otherwise. Indeed, although the car was eventually impounded, there is no evidence that any formal inventory of the contents, such as the extra license plate with validation tabs, was ever made. As a result, Officer Nelson could not verify whether the registration and rental agreement were in the car, could not recall where Johnson's provisional license was found, and could not describe what items were in the car when it was returned to the rental car company. Significantly, the only place that certain items found in the car were documented was in the police report, known as the "Statement of Probable Cause," where only the items seized as evidence of the charged crime were referenced. Def. Ex. 3.

All of these factors appear to be more consistent with a search for evidence rather than an inventory search. *See Brown*, 787 F.2d at 932 (stating that an inventory search may not be

conducted for the purpose of gathering incriminating evidence); *see also Haro-Salcedo*, 107 F.3d at 773 (stating that the fact that officer "was not familiar with" the inventory policy, "could not describe the usual extent of an inventory search conducted in accordance with that policy," and "did not complete a written inventory form" "strongly supported the conclusion that" the officer used the inventory as a "pretextual investigatory search"); *cf. Opperman*, 428 U.S. at 376 (upholding an inventory search when "there is no suggestion whatever that this standard procedure . . . was a pretext concealing an investigatory police move"). Thus, it was incumbent on the Government to establish that Officer Nelson's actions in initiating an ostensible inventory search comported with PGPD policy. In the absence of evidence demonstrating that the inventory search was authorized or conducted pursuant to standard departmental procedures, and particularly in light of the indicia that the search was aimed at gathering evidence, the Court concludes that the Government has failed to establish that the search initiated by Officer Nelson was the start of a valid inventory search. The Court therefore concludes that Officer Nelson's initiation of a search of the vehicle was an unlawful search not justified by any exception to the warrant requirement of the Fourth Amendment.

## IV.    Taint

As discussed above, the Court concludes that the officers' actions, specifically the pat frisk for weapons and initiation of a search of the car, exceeded their authority under the Fourth Amendment and thus were not, as required by *Terry*, reasonably related in scope to the circumstances that justified the initial investigatory stop. After Johnson was frisked and the search of the vehicle began, Johnson asked if he could retrieve the battery to his LVAD from his bookbag in the car's trunk. Officer Hernandez refused to allow him to retrieve it, but instead opened the trunk, located the battery inside the bookbag, and in the process discovered the

firearm that formed the basis of Johnson's arrest. There was a factual dispute whether Johnson asked Hernandez to retrieve the battery for him, or whether Hernandez announced that he would do so and Johnson simply did not respond. Johnson argues that the discussion about the battery and the subsequent recovery of the firearm were tainted by the officers' unconstitutional actions, such that the firearm and ammunition must be suppressed. The Government argues that even if the officers unconstitutionally exceeded the scope of a valid *Terry* stop, the search of the bookbag was lawful because Johnson voluntarily consented to it.

Ordinarily, evidence derived from unconstitutional police action is inadmissible as fruit of the poisonous tree. *Wong Sun*, 371 U.S. at 485-86. For example, in *Powell*, the Fourth Circuit held that where the defendant was, like Johnson, a passenger in a vehicle stopped by the police who was subjected to an unlawful pat frisk, a firearm and drugs found in subsequent searches of his backpack and person had to be suppressed. *Powell*, 666 F.3d at 184, 189. Thus, in order for the Court to uphold the recovery of the firearm based on Johnson's purported consent, the Government must establish by a preponderance of the evidence both that (1) Johnson's consent to search the bookbag was voluntary; and (2) his consent was an act of free will sufficient to purge the taint of the Fourth Amendment violations. *See Digiovanni*, 650 F.3d at 513. Thus, even if voluntariness is shown, evidence recovered pursuant to a consent search is inadmissible if it is the product of the illegal conduct "and not the result of an independent act of free will." *Florida v. Royer*, 460 U.S. 491, 501 (1983) (plurality opinion).

When the Government claims that the defendant's consent to a search attenuated any taint from a Fourth Amendment violation, a court nevertheless may suppress evidence obtained during that search if it is not satisfied both that the consent was given voluntarily and that the circumstances were sufficient to purge the taint of the prior illegality. For example, in

24

*Digiovanni*, where a *Terry* stop was unlawfully extended in scope and duration based on questioning about drugs, the district court found that the defendant's eventual written consent to a search of the vehicle was involuntary. *Digiovanni*, 650 F.3d at 506, 514-15. In *Royer*, the Supreme Court held that where law enforcement agents illegally detained the defendant in a back room at the airport and held his airline ticket and luggage, his eventual consent to a search of his luggage "was tainted by the illegality and was ineffective to justify the search." *See Royer*, 460 U.S. at 501-03, 507-08.

In *United States v. McCraw*, 920 F.2d 224 (4th Cir. 1990), after an illegal entry into a hotel room to effect a warrantless arrest, the Fourth Circuit held that even if the defendant's subsequent consent to search the room was voluntary, it was tainted by the unlawful entry. *Id.* at 230. The Court concluded that the "proximity in time and place" between the illegal arrest and the defendant's consent, and the absence of intervening circumstances, required suppression of the evidence "to protect the physical integrity of the home and to vindicate the purpose of the fourth amendment." *Id.* Similarly, in *United States v. Thomas*, 955 F.2d 207 (4th Cir. 1992), law enforcement officers effected an illegal entry into a hotel room that revealed evidence of a bank robbery, which led them to arrest and handcuff two defendants and disclose to one of them what they had found. Although the defendants both consented to a search of their hotel room, the Fourth Circuit held that the consent did not cure the taint of the earlier illegal search because it was "apparent" that both defendants' consents were "fruit of the original illegal entry." *Id.* at 211 (quoting *United States v. Collazo*, 732 F.2d 1200, 1204 n.* (4th Cir. 1984)).

Here, even if Johnson's request for Officer Hernandez to retrieve the battery pack were voluntary, the taint from the officers' prior unlawful actions was not sufficiently attenuated to render lawful the consent to search and the discovery of the handgun. Whether the taint has been

sufficiently attenuated to permit admission of the resulting evidence depends on: (1) the amount of time between the illegal action and the acquisition of evidence, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975). A finding with respect to attenuation "can only be made after consideration of all the circumstances of the case." *United States v. Seidman*, 156 F.3d 542, 548 (4th Cir. 1998).

The first factor weighs in favor of suppression. Assuming Johnson consented to a search of the bookbag, he did so during the same encounter as, and immediately following, the Fourth Amendment violations. On the second factor, no intervening circumstances purged the taint of these illegal acts. Johnson's request that he be permitted to retrieve the battery, and his acquiescence to Officer Hernandez opening the bookbag to find it, did not purge the taint of illegality because the Court finds that the illegal conduct itself caused Johnson's request for the replacement LVAD battery, which led to the discovery of the firearm. *See Thomas*, 955 F.2d at 211 (holding that consent did not cure the taint of an illegal search where the consent itself was a "fruit of the original illegal entry"); *McCraw*, 920 F.2d at 230 (finding that the consent to search did not purge the taint of an illegal entry, where there were no "intervening circumstances," even if it was "voluntary by fifth amendment standards").

At the time of the traffic stop, one of Johnson's two batteries had run out, but the other had four hours of charge remaining. Thus, had Officer Nelson issued citations to Simpson and let Johnson drive the car away, which the Government conceded he would have done had he determined that Johnson had a valid license and was the renter of the vehicle, the traffic stop would have ended in a few minutes and there would have been no need for Johnson affirmatively to seek to retrieve the battery from the trunk. However, the unlawful pat frisk and the initiation

26

of an unlawful search of the car, which was itself the result of the unreasonable decision to impound, changed the situation. The illegal frisk sent the message that Johnson might be detained. Indeed, Officer Nelson acknowledged that Johnson was not free to leave the scene throughout the encounter. Then the initiation of the car search caused Johnson to believe that the car would be removed, creating a legitimate concern that he would be separated from the replacement battery, which could not be easily obtained elsewhere, for more than the four hours remaining on the sole live battery. This concern was further validated by Officer Nelson's statement, whether transmitted or not, about getting a tow truck. Indeed, Johnson's decisions to ask for access to the battery and then to allow Officer Hernandez to open the bookbag and retrieve it only make sense under the circumstances if he had developed a concern that he was about to be separated from the car and the battery. Thus, Johnson's consent was not "sufficiently independent of a constitutional violation so as to dissipate the taint" and was not "truly an act of free will, as opposed to a product of the prior illegality." *United States v. Burke*, 605 F. Supp. 2d 688, 701 (D. Md. 2009).

There were no other potential intervening circumstances. This case therefore differs from *United States v. Boone*, 245 F.3d 352, 362 (4th Cir. 2001), cited by the Government, in which law enforcement conducted a *Terry* stop on the defendant's car at gunpoint, handcuffed the defendant, who was a suspect in a murder by use of a pipe bomb, and secured written consent to search both the defendant's car and then, later, his home. *Id.* at 356. Noting that "[c]onsent given while in custody may still be voluntary," the court upheld the voluntariness of the consent based on the finding that the defendant, after being detained, was intentionally "cooperating with police and trying 'to convince the police that he had nothing to hide.'" *Id.* at 362-63. The court also concluded that even if the *Terry* stop were deemed unlawful, the searches were still

permissible based on consent, in part because the defendant received his *Miranda* warnings, had intentionally cooperated to deflect suspicion away from him, had engaged in "small talk" with officers, and was allowed to drive his own car, accompanied by an officer, to his home prior to the search. *Id.* at 363. Although the *Boone* court did not specifically address whether intervening circumstances dissipated any taint, it focused on this series of intervening events, occurring over a period of multiple hours and different locations. *See Burke*, 605 F. Supp. 2d at 703 (distinguishing *Boone* on the basis that numerous facts in that case indicated that the defendant's consent was an independent act of free will).

By contrast, as in *Royer*, *McCraw*, and *Thomas*, Johnson's consent occurred immediately after the illegal conduct, without intervening events such as voluntary cooperation, conversation with officers about other topics, and the defendant driving to another location. There was no lengthy, voluntary conversation in which Johnson showed a clear willingness to converse with a law enforcement agent despite prior Fourth Amendment violations. *See Seidman*, 156 F.3d at 549 (holding that there was no need to suppress statements to a confidential informant after the informant unlawfully let himself into the defendant's home because the defendant "shut the front door," "motioned him into the kitchen," and engaged in a 45-minute consensual conversation, all of which were intervening circumstances). The Court thus finds a lack of intervening circumstances that could have purged the taint of the illegal activity. *See Burke*, 605 F. Supp. 2d at 703 (finding that the defendant's alleged consent to be taken to the police station for fingerprinting was not an intervening circumstance that dissipated the taint of an unlawful traffic stop because "there was no break in the causal chain of events between the illegal stop and Defendant's alleged consent").

Finally, the third factor, the purpose and flagrancy of the misconduct, does not support the conclusion that the taint was dissipated. The officers engaged in pat frisks of Johnson and Simpson for no reason other than that they were apparently trained to do so whenever they remove occupants from a vehicle, a policy which flagrantly violates the Fourth Amendment. *See Johnson*, 555 U.S. at 326. Furthermore, the traffic stop was infused with signs that the stop was conducted not with the goal of issuing citations and sending Johnson and his brother on their way, but with the additional interest of conducting a broader investigation for evidence of additional criminal activity, despite the lack of any indication that there was any additional ongoing criminal activity. These irregularities included Officer Nelson's inexplicable lack of interest in the registration or rental agreement, his failure to "notice" information on the computerized records check stating that Johnson had a valid driver's license, his failure to write out the citations to Simpson before initiating a search of the car, and his failure to take any steps to document the contents of the supposed inventory search. They culminated in multiple constitutional violations, including the illegal pat frisk, the unreasonable decision to impound the Sonata, and the impermissible initiation of an inventory search. Under these circumstances, the Court finds no basis to conclude that the taint of the misconduct was purged. Thus, even without reaching the issue whether Johnson's consent to Officer Hernandez's search of the bookbag was voluntary, the Court concludes that the evidence seized from the bookbag must be suppressed. Under the same reasoning, the Court also suppresses statements made by Johnson after the recovery of the firearm and after his arrest because they were the product of the illegality, the taint of which was not sufficiently attenuated.

## V.    Inevitable Discovery

Finally, the Government argues that the handgun and other evidence should be admitted under the inevitable discovery doctrine because even if the evidence had not been discovered at the scene, it would have been discovered during a later inventory search.    Generally, if the Government can establish by a preponderance of the evidence that evidence acquired as a result of illegal governmental activity "ultimately or inevitably would have been discovered by lawful means," the evidence may be admitted.    *Nix v. Williams*, 467 U.S. 431, 444 (1984).    The Government has not made such a showing.  For the Court to find that the handgun would have inevitably been found during an inventory search, the Government would need to show that (1) it was inevitable the car would have been impounded; (2) an inventory search would have been conducted; and (3) the inventory would have included a search of the bookbag, a closed container within the car, instead of the return of the bookbag to Johnson, a passenger for whom there was no evidence of suspected of wrongdoing at the time of the stop.

This argument fails because there was nothing inevitable about the impoundment or inventory search of the car.  As discussed above, the Court has found that Officer Nelson's decision to impound the car was unreasonable because Johnson had a valid driver's license and was the registered renter of the car, and that decision was itself one of the constitutional violations.  Other than a general statement by Officer Nelson that PGPD "usually" has cars towed, Tr. at 63, there was no testimony or other evidence to show that the car would have been impounded for some other reason had Johnson's ability and authorization to drive the car away been recognized.  Indeed, Officer Nelson testified, and the Government acknowledged, that he had no plans to arrest Simpson, and that if he had known Johnson possessed a valid driver's license, he would have allowed Johnson to drive the vehicle away.

Second, the Government has failed to establish that an inventory search would necessarily have been conducted because it presented no evidence of the PGPD's policies and procedures regarding inventory searches. It is telling that even after the car was impounded after the discovery of the firearm and the arrest of Johnson, there is no record of the inventory search Nelson testified that he completed. Finally, there was no evidence presented on the PGPD inventory search policy that would establish whether a closed container such as a bookbag would be retained even if it belonged to a passenger, and whether such a container would itself be searched as part of an inventory search. *See Wells*, 495 U.S. at 4-5.

The Fourth Circuit recently held that, even where there is no evidence of a written inventory policy, "[t]he government meets its burden . . . on inevitable-discovery grounds if the district court can assess the inevitability and reasonableness of a hypothetical inventory search from testimony provided by a law-enforcement official." *Bullette*, 854 F.3d at 267. Where the evidence has shown that, but for the unreasonable decision to impound the vehicle, this traffic encounter would have ended with Officer Nelson issuing citations to Simpson and Johnson driving the car away, the Government's inevitable discovery argument necessarily fails.

## CONCLUSION

For the foregoing reasons, the Motion to Suppress Tangible Evidence and Statements is GRANTED. A separate Order shall issue.

Date: May 22, 2017

THEODORE D. CHUANG
United States District Judge